IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **JAMES E. NORRIS,** | : | Case No. 1:13-CV-01737 |
| Plaintiff, | : | |
| v. | : | |
| **CAROLYN W. COLVIN,** Acting Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

## I.  INTRODUCTION.

This case was referred to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 137 (Docket No. 19).  Pursuant to 42 U.S.C. § 405(g), Plaintiff, *pro se*, seeks judicial review of Defendant's final determination denying his claims for Disability Insurance Benefits (DIB)[1] made pursuant to Title II of the Social Security Act (Act) and Supplemental Security Income (SSI)[2] made pursuant to Title XVI of the Act.  Pending are the Briefs of the parties and Plaintiff's Supplemental Brief and Reply Brief (Docket Nos. 15, 17, 18 & 27 ).  For the reasons set forth below, the Magistrate recommends that the Court affirm the Commissioner's decision.

## II.  PROCEDURAL BACKGROUND.

---

[1] Eligibility for DIB benefits depends on the co-existence of two prerequisite conditions: disability and insured status.  *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997).  A claimant must be disabled on or before the date his or her insured status expires.  *Id.*

[2] The SSI program provides disability payments to the aged, blind, and disabled if they meet certain income eligibility standards.  42 U.S.C. §§ 1381–1383 (Thomson Reuters 2014).

Plaintiff completed applications for DIB and SSI on July 14, 2009, alleging that his disability began and he became unable to work on July 2, 2007[3] (Docket No. 13, pp. 147-148, 149-152 of 882). Plaintiff requested a hearing following the administrative denials upon initial review and reconsideration (Docket No. 13, pp. 111-114, 115-117, 119-121, 122-124 of 882). On August 24, 2011, Administrative Law Judge (ALJ) Jeffrey M. Jordan conducted a video hearing at which Plaintiff, represented by counsel, and Dr. Fred A. Monaco, a Vocational Expert (VE), appeared and testified (Docket No. 13, p. 67 of 882). ALJ Jordan rendered an unfavorable decision on September 19, 2011(Docket No. 13, pp. 26-38 of 882), and on November 28, 2012, the Appeals Council denied Plaintiff's request for review (Docket No. 13, pp. 17-19 of 882). Plaintiff filed a timely Complaint in the United States District Court for the Northern District of Ohio to challenge the denial of benefits (Docket No. 1).

### III.  FACTUAL BACKGROUND.

The following is a summary of the testimony presented at the hearing before the ALJ (Docket No. 13, p. 69 of 882).

### A.  PLAINTIFF'S TESTIMONY.

Plaintiff testified that he had mental health issues including anxiety, depression and mood swings; back pain that radiated to both legs; controlled diabetes mellitus and hand numbness and tingling that emanated from a cervical disc problem.

Plaintiff claimed that he was diagnosed with a bipolar disorder and that he had mood swings which created a shift in his sleeping patterns. Plaintiff testified that he was unable to handle stress well

---

[3]

On August 11, 2009, Plaintiff, by and through counsel, requested that Plaintiff's concurrent applications for Title II and Title XVI benefits that were filed on December 21, 2007 and denied on April 8, 2008, be reopened (Docket No. 13, p. 110 of 882). ALJ Jordan found the previous determinations were final and binding and there was no reason to reopen and revise the determinations (Docket No. 13, p. 29 of 882).

and that smoking cigarettes helped to relieve stress (Docket No. 13, pp. 76-77, 82 of 882).

For approximately one year preceding the hearing, Plaintiff had begun to experience numbness in his hands that was attributed to a disc problem in his neck.  The onset of numbness was sporadic and it generally did not interfere with Plaintiff's use of his hands (Docket No. 13, pp. 74-75 of 882). Plaintiff testified that his blood sugar was controlled by his twice daily intake of Metformin (Docket No. 13, p. 70 of 882).  Plaintiff had past difficulty with drugs and alcohol; however, over a year ago, he quit smoking marijuana and he cut back on his drinking to one or two beers every few months rather than a 12 or 24-pack at a time (Docket No. 13, p. 80-82 of 882).

Plaintiff estimated that on a repetitive basis, he could lift up to ten pounds; otherwise, he could only lift up to fifteen pounds.  Walking was no easier than standing because of leg pain and sitting for extended periods of time caused back pain.  Plaintiff testified that he could not perform a job that required him to be on his feet six out of eight hours a day.  Not only did he get tired but he had pain from movement of his arms, twisting and bending (Docket No. 13, pp. 73-74).

**B.      THE VE TESTIMONY**.

The VE reviewed the record and affirmed that his testimony was consistent with the information contained in the DICTIONARY OF OCCUPATIONAL TITLES (DOT), a United States Department of Labor publication that organizes jobs in the United States economy based on their similarities and defines the structure and content for performance of all listed occupations (Docket No. 13, p. 84 of 882; DOT, 1991 WL 654964 (4th ed. 1991)).  Based on the record, the VE categorized Plaintiff's past work history by (1) job title, (2) skill requirements, (3) the level of physical exertion; and (4) specific vocational preparation (SVP), an estimate of the amount of lapsed time a typical worker could learn the techniques, acquire the information and develop the facility for average performance of the listed jobs:

3

| (1) DOT | (2) SKILL LEVEL | (3) LEVEL OF PHYSICAL EXERTION | (4) SVP |
|---|---|---|---|
| Blow mold operator in a plastics plant | Semiskilled work is work which needs some skills but does not require doing the more complex work duties; such jobs may require alertness and close attention, coordination and dexterity as when hands or feet must be moved quickly to do repetitive tasks. 20 C.F.R. §§ 404.1568, 416.968. | Medium level of exertion involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). | 3--over one month up to and including three months. Www.onetonline.org. |
| Commercial driver's license certified van driver | Semiskilled | Medium level of exertion | 3 |
| Embossing worker in a factory | Unskilled work is which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength.  20 C.F.R. §§ 404.1568, 416.968. | Medium level of exertion | Not provided |
| Computer numerical control press operator | Semiskilled | Medium level of exertion | 4–over three months up to and including six months. |
| Injection machine operator | Unskilled | Light level of exertion involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). | Not provided |
| Combination prep and line cook. | Semiskilled | Heavy level of exertion involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. | 3 |
| Short order cook | Semiskilled | Medium level of exertion | 4 |
| Furnace tender | Unskilled | Very heavy level of exertion involves lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. 20 C.F.R. §§ 404.1567(e), 416.967(e). | Not provided |

(Docket No. 13, pp. 82-83 of 882).

The ALJ posed the *first* hypothetical:

Consider a hypothetical individual with Plaintiff's age, education and work background; assume further that this hypothetical individual can lift, carry, push/pull up to 10 pounds occasionally, but must avoid above-shoulder lifting, carrying, pushing, pulling.  Can stand and walk six hours

4

within an eight-hour workday, sit six hours within an eight-hour workday; must avoid climbing ladders, ropes and scaffolds; can perform other postural movements occasionally; is limited to simple, routine, low-stress tasks, excluding production quota-type work; assembly line type jobs are excluded; and limited contact with the public.  Could such an individual perform any of Plaintiff's past work?

The VE opined that based on this hypothetical, the individual could not perform any of Plaintiff's past work.  However, there were representative light and sedentary jobs that even with a required sit/stand option, the hypothetical person could perform and the numbers of these jobs are as follows:

| POSITIONS | NUMBER OF LIGHT POSITIONS | NUMBER OF SEDENTARY POSITIONS |
| --- | --- | --- |
| Cutters, solderers, brazers<br>DOT 752.687-022 | 84,000 | 37,000 |
| Testers, sorters and weighers<br>DOT 732.687-026 | 124,000 | 13,000 |
| Abrasive and extruding machine operators<br>DOT 690.685-194 | 57,000 | 5,000 |

(Docket No. 13, pp. 83, 84-85 of 882).

Plaintiff's attorney posed a *second* hypothetical adding a mental component to the same physical limitations posed in hypothetical number one:

What if the person was also limited . . . plus they had a marked limitation in the ability to pay attention and concentration for extended periods, would there be a job available?

The VE opined that there would be no jobs available based on the additional limitations (Docket No. 13, p. 85 of 882).

The attorney posed a *third* hypothetical:

. . . . the hypothetical person had the same qualifications as hypothetical number one, plus the marked limitation with regard to the ability to complete a normal workday and workweek without interruption from psychological symptoms, would there be jobs?

The VE explained that there would be no jobs available based on the limitations posed in hypothetical

5

number three (Docket No. 13, p. 85 of 882).

The attorney posed a *fourth* hypothetical:

. . . .if in addition to hypothetical number one, a marked limitation in their ability to accept instruction, and respond appropriately to criticism from supervisors, and get along with peers without distracting them with behavioral extremes, would there be any jobs.

The VE opined that there would be no jobs available based on the limitations posed in hypothetical number four (Docket No. 13, p. 85 of 882).

## IV. MEDICAL EVIDENCE[4].

### A.    UNIVERSITY HOSPITALS HEALTH SYSTEM.

On April 28, 2004, Plaintiff had an episode during which he expressed homicidal and suicidal ideations.  Dr. Michael Ray, M.D., a psychiatrist, acknowledged Plaintiff's history of bipolar disorder and opined that Plaintiff's behavior was influenced considerably by delusions or hallucinations or serious impairment, in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends).  Dr. Ray extended Plaintiff's hospitalization to one week during which Plaintiff was treated primarily for mood instability and chemical dependency.  Medication was prescribed and behavioral modification counseling was employed to stabilize Plaintiff's mood and establish his safety and the safety of his family (Docket No. 13, pp. 281, 282-286 of 882; www.healthgrades.com/physician/dr-michael-ray).

### B.    ASHTABULA COUNTY MEDICAL CENTER, AN AFFILIATE OF THE CLEVELAND CLINIC HEALTH CENTER.

On April 13, 2009, Plaintiff underwent an ultrasound of the right upper quadrant.  The pancreas

---

[4]

The medical records of Wendi Smith and Kenneth Norris, both of which were inadvertently filed in Plaintiff's record, were excluded from review in this case (Docket No. 13, pp. 683-689, 691-788 of 882).

was inadequately visualized but the right upper quadrant views were unremarkable (Docket No. 13, p. 331 of 882).

Plaintiff sought treatment for abdominal pain on May 1, 2009. The results from the radiological tests showed evidence of possible inflammation of the gallbladder (Docket No. 11, p. 330 of 882).

Plaintiff presented with complaints of back pain and injury. The treating physician prescribed medications to relieve pain (Docket No. 11, pp. 505-510 of 882).

On July 2, 2010, Plaintiff was assaulted and the attending physician could not rule out soft tissue injury to Plaintiff's nose and right jaw even though there was no evidence of acute displaced fracture (Docket No. 13, pp. 496-504 of 882).

## C.    DR. JOHN LEE, D.O.

Medical records for treatment which span approximately one year show that on these dates, Dr. Lee managed Plaintiff's health care accordingly:

| DATE: | COURSE OF TREATMENT: |
|---|---|
| June 26, 2008 | Continued medications for hypertension and bipolar disorder (Docket No. 13, p. 344 of 882). |
| July 1, 2008 | Completed the BASIC MEDICAL form for the Ashtabula County Department of Human Services (ACDHS), in which Dr. Lee described Plaintiff's medical conditions as lower back pain, bipolar disorder and hypertension. Despite these impairments, Dr. Lee opined that Plaintiff could sit and stand/walk eight out of an eight-hour workday, two hours without interruption; and lift/carry up to 20 pounds frequently and occasionally and Plaintiff's ability to bend and use repetitive foot movements was moderately limited (Docket No. 13, p. 414 of 882). |
| July 10, 2008 | Increased dosage of medication used to regulate hypertension. Results from blood sugar and liver function test results were elevated (Docket No. 13, p. 343 of 882). |
| July 24, 2008 | Continued medications for hypertension and diabetes and prescribed medication used to regulate lipids (Docket No. 13, p. 342 of 882). |
| March 16, 2009 | Shared with Plaintiff the results from radiological study of shoulders which showed no evidence of pathology and was generally unremarkable (Docket No. 13, pp. 332-333, 341 of 882). |
| April 7, 2009 | Modified medications used for the treatment of hypertension, diabetes and hyperlipidemia and ordered an ultrasound of the liver (Docket No. 13, p. 340 of |

|  | 882). |
|---|---|
| April 21, 2009 | Shared with Plaintiff that the ultrasound showed a gallstone (Docket No. 13, p. 339 of 882). |
| April 27, 2009 | Referred Plaintiff to Dr. Timothy O'Brien, M.D., for evaluation of elevated liver function test.  Dr. O'Brien suggested that Plaintiff undergo an imaging scan designed to diagnose problems with the liver, gallbladder and bile ducts (Docket No. 13, p. 338 of 882). |
| April 28, 2009 | Referred Plaintiff to a dentist to resolve left sided jaw pain secondary to dental caries and prescribed MiraLAX® to relieve constipation (Docket No. 13, p. 337 of 882). |
| May 5, 2009 | Continued the current drug therapy including MiraLAX® (Docket No. 13, p. 376 of 882). |
| May 6, 2009 | Conferred with Dr. O'Brien who determined that based on the results from the decreased ejection on the imaging scan used in this case to diagnose problems with the liver, gallbladder and bile, there were no symptoms suggestive of biliary colic (Docket No. 13, p. 335 of 882). |
| May 9, 2009 | Continued medications including MiraLAX® (Docket No. 13, p. 336 of 882). |
| June 1, 2009 | Noted that Plaintiff's low back pain appeared to be stable (Docket No. 13, p. 334 of 882). |
| June 1, 2009 | Completed the BASIC MEDICAL form for the ACDHS, describing Plaintiff's medical conditions as low back pain, bipolar disorder and hypertension.  Dr. Lee opined that despite these impairments, Plaintiff could sit and stand/walk eight hours out of an eight-hour workday, two hours without interruption; and Plaintiff could lift/carry up to 20 pounds frequently and occasionally; and Plaintiff's ability to bend and engage in repetitive foot movements was moderately affected (Docket No. 13, p. 417 of 882). |
| June 16, 2009 | Continued medications for diabetes, hypertension and hyperlipidemia (Docket No. 13, p. 373 of 882). |
| July 1, 2009 | Prescribed Darvocet for shoulder and mid-back pain (Docket No. 13, p. 372 of 882). |
| July 7, 2009 | Prescribed physical therapy to assist with mild back pain and treated a rash (Docket No. 13, p. 371 of 882). |

**D.    MARYMONT NORTH HOSPITAL AND KEYSTONE REHABILITATION SYSTEMS.**

Plaintiff was involved in a motor vehicle accident on June 8, 2009 and sustained whole body pain that was more intense in his lower back, neck and shoulders.  Plaintiff was prescribed narcotic medications to relieve the pain (Docket No. 13, pp. 363-370 of 882).  In addition to the drug therapy, on June 16, 2009, he was evaluated for physical therapy and through July 6, 2009, Plaintiff participated in therapeutic exercises designed to decrease pain and increase range of motion and flexibility.  The exercises were

8

supplemented with up to eight minutes of manual therapy targeted at increasing joint mobilization. Occasionally, hot packs were applied to the lower back (Docket No. 13, pp. 398-399, 400-412 of 882).

E.    **UNIVERSITY HOSPITALS HEALTH SYSTEM/GENEVA MEDICAL CENTER**.

Plaintiff presented on April 27, 2004, with depression and suicidal and homicidal thoughts.  The emergency room physician evaluated Plaintiff and prepared commitment papers. He was transported by ambulance to the Laurelwood facility for  psychiatric care (Docket No. 13, pp. 321-329 of 882).

On May 21, 2008, Dr. Daniel C. Modarelli, D.O., Plaintiff's primary care physician at that time, prescribed Cymbalta, an antidepressant.  Later that day, Plaintiff presented to the emergency room with symptoms of depression related to the volatile relationship with his spouse and sudden onset suicidal thoughts, a possible side effect of the medication.  Dr. Marian Barnett-Rico, M.D., the emergency room physician, conducted a complete blood work, serum chemistry, urinalysis and toxicology screening. Plaintiff's glucose level was "a little high," his blood work and serum chemistry were normal and his urinalysis and toxicology screen were negative for illegal drugs (Docket No. 13, pp. 303, 304-320 of 882).

On January 20, 2010, Plaintiff presented to the emergency room after feigning suicidal ideations to avoid a religious debate with his mother.  Plaintiff's mood was stabilized and he was discharged.  I t was noted that Plaintiff's cholesterol was elevated (Docket No. 13, pp. 454-459 of 882).

On August 9, 2010, Plaintiff presented to the emergency room with vague inferences to suicide and complaints of depression.  Plaintiff was subjected to multiple laboratory studies and evaluations and released when his mood was stabilized (Docket No. 13, pp. 514-527 of 882).

Plaintiff presented and was treated on August 25, 2010 and September 28, 2010, for low back pain (Docket No. 13, pp. 795-800 of 882).

The magnetic resonance imaging (MRI) of Plaintiff's cervical spine conducted on November 19,

9

2010, showed abnormality at C6/7; otherwise there was no canal or neural foraminal narrowing at C2/3, C3/4, C4/5, C5/6, C6/7 and C7/TI (Docket No. 13, p. 794 of 882).

Plaintiff underwent an epidural steroidal injection on May 5, 2011 (Docket No. 13, pp 790-792 of 882).

**F.    DR. PAUL C. HANAHAN, M.D., A SPECIALIST IN OCCUPATIONAL MEDICINE.**

On September 16, 2010, Plaintiff presented for evaluation and treatment of back, neck and shoulder pain. Diagnosed with cervical disc disease and lumbar disc herniation, Plaintiff was prescribed a Medrol Dosepak, medication used to reduce swelling and pain, and Roxicodone, an opioid analgesic. Dr. Hanahan conducted follow-up examinations and monitored Plaintiff's use of pain medication on September 30, 2010,October 29, 2010, November 23, 2010, December 22, 2010, February 18, 2011, March 18, 2011, April 15, 2011, May 13, 2011, June 10, 2011 and July 7, 2011 (Docket No. 13, pp. 802-809, 812-819 of 882).

Based upon Dr. Hanahan's recommendation, Plaintiff participated in seven physical therapy sessions beginning on February 14, 2011. At the conclusion of the sessions, Plaintiff's pain had decreased from constant to intermittent, from a 5 to a 3 and some gain in strength and range of motion had been achieved (Docket No. 13, pp. 856-857 of 882).

Plaintiff underwent further physical therapy beginning on May 16, 2011 and ending on June 9, 2011. The progress note to Dr. Hanahan reported that Plaintiff's present shoulder pain level was zero and his back pain level was three of 10. Plaintiff reported a 30% improvement overall (Docket No. 13, pp. 863-876 of 882).

On August 9, 2011, Dr. Hanahan completed a "MEDICAL STATEMENT REGARDING LOW BACK PAIN, ARACHNOIDITIS OR SPINAL STENOSIS", in which he determined that based on his knowledge,

personal observations and review of the prior medical history, Plaintiff 's condition was characterized as follows:

1. Neuro-anatomic distribution of pain.
2. Limitation of motion of the spine.
3. Sensory or reflex loss.
4. Positive straight leg raising test.
5. Need to change position more than once every two hours.
6. Marked pain.

It was Dr. Hanahan's opinion that even with low back pain, Plaintiff could:

1. Work two hours daily.
2. Stand for one hour in an eight-hour workday.
3. Sit for one hour in an eight-hour workday.
4. Walk for one hour in an eight-hour workday.
5. Lift on an occasional basis, 10 pounds.
6. Lift on a frequent basis, 5 pounds.
7. Bend occasionally.
8. Stoop occasionally (Docket No. 13, pp. 838-839 of 882).

Similarly, Dr. Hanahan opined that Plaintiff had the following problems with his left shoulder:

1. Limitation of motion.
2. Weakness.
3. Pain.
4. Tendinitis.
5. Acromioclavicular joint arthritis.

It was Dr. Hanahan's opinion that even with shoulder pain, Plaintiff could:

1. "Work" two hours daily.
2. Stand for fifteen minutes in an eight-hour workday.
3. Sit for thirty minutes in an eight-hour workday.
4. Stand in workday sixty minutes.
5. Sit in workday sixty minutes.
6. Lift on a frequent basis, 5 pounds.
7. Lift on an occasional basis, ten pounds.
8. Never raise his left hand over shoulder.

Dr. Hanahan concluded that Plaintiff suffered from pain that presented a serious limitation in his ability to function (Docket No. 13, pp. 838-841 of 882).  In sum, the intensity and persistence of the pain

11

as experienced by Plaintiff affected his ability to do work-related activities and it often affected his ability to concentrate (Docket No. 13, pp. 842-843 of 882).

G.    PHYSICIANS PLUS, INCORPORATED.

Dr. D. K. Lee examined Plaintiff on June 21, 2010, and elicited a detailed medical history. Dr. Lee ordered diagnostic tests and continued the then current drug regimen (Docket No. 13, pp. 532-533 of 882).

On August 2, 2010, Dr. Lee ordered physical therapy and on August 6, 2010, Dr. Lee reported the results from the diagnostic testing of the spine. Specifically, there was a loss of normally anticipated curve on the lateral projection of the cervical spine; a wedging of disc space at T3-T4 and T5-T6 in the thoracic spine; and misalignment from L3 to S1 in the lumbar spine (Docket No. 13, pp. 530, 531 of 882).

H.    HERGENROEDER ORTHOPEDIC CLINIC.

On August 14, 2008, no orthopedic problems were noted. Rather, Plaintiff's mental disorder was more severe (Docket No. 13, p. 824 of 882).

On September 9, 2010, Plaintiff was diagnosed with L/4 disc herniation and small disc protrusion at T5/6 and T/8-9 (Docket No. 13, pp. 822 of 882).

I.    DR. BRIAN BURTCH, M.D.

Plaintiff consulted with Dr. Burtch regarding his diabetes. In February, 2011, Plaintiff's diabetes was under "reasonable control" and the prescription for Metformin was modified (Docket No. 13, pp. 852-853 of 882).

By May 24, 2011, Dr. Burtch noted that Plaintiff's blood pressure was suboptimal yet his lipids were at goal and his current diabetes management was continued (Docket No. 13, p. 851 of 882).

J.    OHIO DEPARTMENT OF JOB AND FAMILY SERVICES (ODJFS).

12

On December 28, 2007, Dr. Modarelli completed a BASIC MEDICAL form and addressed Plaintiff's complaints of chronic pain in his back that radiated to his left leg and even caused some hip discomfort (Docket No. 13, p. 299 of 882).

Dr. Modarelli completed a BASIC MEDICAL form on May 21, 2008.  Notably, he considered that Plaintiff:

(1)  had a *marked* limitation in the ability to bend.
(2)  was moderately limited in his ability to reach.
(3)  could sit and stand/walk for four hours in an eight-hour workday each, two hours without interruption.
(4)  could lift/carry both frequently and occasionally, up to 20 pounds (Docket No. 13, pp. 298, 421 of 882).

K.  **MENTAL FUNCTIONAL CAPACITY ASSESSMENTS, PSYCHIATRIC REVIEW TECHNIQUE, PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT AND BIPOLAR DISORDER AND RELATED CONDITIONS.**

Four medical sources, namely, (1) Drs. James Cozy, M. D., (2) Patricia Semmelman, Ph. D., (3) Daniel B. Keaton, M.D., and (4) Walter Holbrook, M.D., conducted a review of the evidence in the file and made summary conclusions of Plaintiff's capacity to sustain activity within the context of a normal workday and workweek on an ongoing basis.

**(1)  DR. COZY**.

On December 2, 2007, Dr. Cozy determined that Plaintiff had *marked* limitations in the following abilities to:

(1)  understand and remember very short and simple instructions.
(2)  understand and remember detailed instructions.
(3)  accept instructions and respond appropriately to criticism from supervisors.
(4)  get alone with co-workers or peers without distracting them or exhibiting behavioral extremes.
(5)  be aware of normal hazards and take appropriate precautions.
(6)  set realistic goals or make plans independently of others.

Dr. Cozy concluded that Plaintiff was unemployable and that his physical and/or mental functional

13

limitations were expected to last more than 12 months (Docket No. 13, pp. 288-289 of 882).

**(2)  DR. SEMMELMAN.**

Dr. Semmelman determined on August 27, 2009 that Plaintiff had *no marked* limitations but he

had moderate limitations in the following abilities to:

    (1)    complete a normal workday and workweek without interruptions from psychologically based symptoms.
    (2)    interact appropriately with the general public.
    (3)    respond appropriately to changes in the work setting (Docket No. 13, pp. 417-430 of 882).

In addition, Dr. Semmelman completed the PSYCHIATRIC REVIEW TECHNIQUE form covering July 2, 2007

through August 12, 2009.  She determined that there was evidence of a bipolar disorder, an anxiety

disorder, not otherwise specified, alcohol dependence and marijuana abuse.  As a result of Plaintiff's

mental disorders, Plaintiff had the following degree of functional limitations:

    (1)    Restriction in activities of daily living    Mild.
    (2)    Difficulties in maintaining social functioning    Moderate.
    (3)    Difficulties in maintaining concentration, persistence and pace    Moderate.
    (4)    Episodes of decompensation    None.

Dr. Semmelman opined that there was no evidence of impairment-related functional limitations that are

incompatible with the ability to do any gainful activity (Docket No. 13, pp. 431-444 of 832).

**(3)  DR. KEATON.**

On July 14, 2009, Dr. Keaton who has specialities in family medicine and psychiatry, determined

that Plaintiff had *marked* limitations in the ability to:

    (1)    maintain attention and concentration for extended periods.
    (2)    complete a normal workweek and workday without interruptions from psychologically based symptoms.
    (3)    accept instructions and respond appropriately to criticism from supervisors.
    (4)    get along with co-workers or peers without distracting them or exhibiting behavioral extremes.
    (5)    respond appropriately to changes in the work setting.

14

     (6)     travel in unfamiliar places or use public transportation.

     (7)     set realistic goals or make plans independently of others (Docket No. 13, pp. 425-426, 882 of 882).

In the BIPOLAR DISORDER AND RELATED CONDITIONS form that Dr. Keaton completed on August 18, 2011, he opined that:

     (1)     Plaintiff had moderate restriction of activities in daily living and moderate difficulty in maintaining social functioning.

     (2)     There were deficiencies in concentrating, persistence and pace present and repeated episodes of decompensation or deterioration.

     (3)     Plaintiff had *marked* impairments in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Docket No. 13, pp. 879-881 of 882).

**(4)**    **DR. HOLBROOK**.

On November 6, 2009, Dr. Holbrook reviewed all of the evidence in the file and based on his reasoned judgment made the following findings:

     (1)     Plaintiff could lift/carry up to twenty pounds occasionally.

     (2)     Plaintiff could lift/carry up to ten pounds frequently.

     (2)     Plaintiff could stand/walk six hours in an 8-hour workday.

     (3)     Plaintiff could sit for about six hours in an 8-hour workday

     (4)     Plaintiff could engage in unlimited pushing and/or pulling.

     (5)     Plaintiff could frequently stoop and crouch due to back problems.

     (6)     Plaintiff's ability to stoop and crouch were limited to "frequent due to back problems.

     (7)     Plaintiff had no manipulative, visual, communicative or environmental limitations (Docket No. 13, pp. 446-453 of 738).

**L.**    **RICHARD C. HALAS, M.A., CLINICAL PSYCHOLOGIST.**

At the Bureau of Disability Determination's request, Mr. Halas performed an individual psychological evaluation on March 17, 2008, focusing on Plaintiff's current levels of adjustment and mental status to facilitate a long-term disability determination.  Notably:

     (1)     Plaintiff appeared obese and visibly unkempt.

     (2)     Plaintiff was aware of the ramifications of the need for the examination.

     (3)     Plaintiff did not "show to have any specific problems with fragmentation of thought or

15

flight of idea;" or high levels of anxiety.

Using the standard five-axis classification in DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Mr. Halas concluded:

| THE FIVE-AXIS MODEL USED TO ACCOUNT FOR THE PATIENT'S MENTAL HEALTH. | MR. HALAS'S IMPRESSIONS OF PLAINTIFF'S MENTAL STATUS. |
| --- | --- |
| I.  Clinical Disorders | Polysubstance abuse, currently in remission and bipolar disorder, mixed type. |
| II. Personality Disorders and Intellectual Disabilities | No diagnosis. |
| III. General Medical Condition | Deferred for medical examination. |
| IV. Psychosocial and environmental Disorders | Unemployment, financial concerns, health concerns, dependency upon parents |
| V.  The GAF | 45. A score of 45 denotes serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work). |

Mr. Halas suggested that Plaintiff was unable to manage his funds in an appropriate, practical and realistic manner due to history of substance abuse and lack of participation in the 12-step program.  When assessing Plaintiff's four work-related mental abilities, Mr. Halas rated Plaintiff's mental abilities accordingly:

(1)    To relate to others was moderately impaired.  His symptoms of depression and mood disorder would restrict his effectiveness in this area.
(2)    To follow through with simple one and two-step instructions and or directions was mildly impaired.
(3)    To do simple, repetitive tasks is intact and not impaired.
(4)    To withstand the stresses and pressures associated with most day-to-day work settings was intact and not impaired (Docket No. 13, p. 293 of 882).

M.    DR. JERRY BELL, M. D., A FAMILY MEDICINE SPECIALIST.

Medical records for treatment which span approximately fourteen months show that on these dates, Dr. Bell managed Plaintiff's health care accordingly:

16

| <u>DATE:</u> | <u>COURSE OF TREATMENT</u>: |
|---|---|
| July 31, 2009 | Prescribed antibacterial medication to treat a rash on Plaintiff's shoulder (Docket No. 13, pp. 491-492 of 882). |
| August 7, 2009 | Prescribed an antibiotic to treat a superficial abscess on Plaintiff's left shoulder (Docket No. 13, p. 490 of 882). |
| August 14, 2009 | Noted that the rash was resolved and the abscess had improved (Docket No. 13, pp. 488-489 of 882). |
| September 8, 2009 | Refilled Plaintiff's medications used to control diabetes, hypertension and hypercholesterolemia (Docket No. 13, pp. 485-486 of 882). |
| September 28, 2009 | Diagnosed Plaintiff with an acute upper respiratory infection (Docket No. 13, p. 483-484 of 882). |
| October 20, 2009 | Diagnosed Plaintiff with acute maxillary sinusitis (Docket No. 13, pp. 481-482 of 882). |
| November 6, 2009 | Started Plaintiff on Prednisone to treat right heel pain (Docket No. 13, pp. 479-480 of 882). |
| November 13, 2009 | Started Plaintiff on a non-steroidal anti-inflammatory drug to resolve complaints of ankle, foot and back pain (Docket No. 13, pp. 477-478 of 882). |
| November 20, 2009 | Started Plaintiff on a muscle relaxant to assist with right leg and low back pain (Docket No. 13, pp. 475-475 of 882). |
| December 8, 2009 | Noted that the results from Plaintiff's glucose test showed elevated levels even with fasting (Docket No. 13, pp. 473-474 of 882). |
| January 8, 2010 | Refilled Plaintiff's prescriptions after conducting pharmacological review (Docket No. 13, p. 471-472 of 882). |
| February 2, 2010 | Ordered diagnostic imaging to determine etiology of chronic nausea and diarrhea daily (Docket No. 13, pp. 469-470 of 882). |
| February 12, 2010 | Concluded based on Plaintiff's reports that his pain medication was working (Docket No. 13, pp. 467-468 of 882). |
| March 15, 2010 | Ordered further laboratory examinations because Plaintiff complained that his pain was not getting any better (Docket No. 13, pp. 680-681 of 882). |
| March 30, 2010 | Continued Plaintiff's current medications (Docket No. 13, pp. 678-679 of 882). |
| April 9, 2010 | Prescribed a topical treatment to deliver medication directly to the source of back pain (Docket No. 13, pp. 676-677 of 882). |
| May 10, 2010 | Considered Plaintiff's left shoulder pain (Docket No. 13, pp. 673-674 of 882). |
| May 17, 2010 | Considered that with medication, Plaintiff's back pain was less severe (Docket No. 671-672 of 882). |
| May 25, 2010 | Determined that the blood in Plaintiff's urine triggered no suggestion of abnormality (Docket No. 13, pp. 669-670 of 882). |
| June 7, 2010 | Continued the pain medication after Plaintiff engaged in strenuous activity (Docket No. 13, pp. 667-668 of 882). |
| June 16, 2010 | Conducted a follow-up examination on Plaintiff's diabetes and determined that Plaintiff's glucose level was within a normal range for a person who recently ate (Docket No. 13, pp. 664-666 of 882). |
| July 14, 2010 | Conducted a follow-up examination on Plaintiff's diabetes and his glucose level |

17

|  | was elevated (Docket No. 13, pp. 662-663 of 882). |
|---|---|
| August 11, 2010 | Results from the diagnostic imaging showed central and left paramedian disc herniation at L4-L5 with impingement on the left L5 nerve root in the lumbar spine; very small central disc protrusion at T5-T6; and mild levoscoliosis in the lumbrosacral spine (Docket No. 11, p. 534-536 of 882). |
| August 18, 2010 | Referred Plaintiff for an orthopedic consultation (Docket No. 13, pp. 658-659 of 882), and on August 25, 2010, Dr. Susan E. Stephens, M.D., conducted an orthopedic consultation during which she diagnosed Plaintiff with "L4-L5 disc with osteophyte and stenosis," prescribed medication and suggested further treatment with injections (Docket No. 13, pp. 541-542 of 882). |
| August 30, 2010 | Plaintiff underwent an injection (Docket No. 13, p. 544-545 of 882). |
| September 7, 2010 | Noted that although Plaintiff continued to have left arm pain and numbness, he had gained wonderful control over his diabetes and cholesterol (Docket No. 13, pp. 655-657 of 882). |
| September 14, 2010 | Educated Plaintiff on the use of a Glucometer (Docket No. 13, pp. 653-654 of 882). |
| September 15, 2010 | Discussed with Plaintiff the results from a comprehensive metabolic panel from a specimen collected in June 2010, that showed elevated hemoglobin and HDL levels (Docket No. 13, pp. 649-652 of 882). |

**N.      SIGNATURE HEALTH.**

From May 22, 2008 through September 8, 2010, Plaintiff underwent therapeutic counseling and intervention services which focused on understanding and learning how to change problematic feelings and behaviors associated with unemployment and health issues (Docket No. 13, pp. 546-551, 554-558, 560-561, 564-595, 598-604, 607-616, 620-625, 628-629, 632-634, 847-848 of 882). Simultaneous with therapeutic counseling, Dr. Khoa Tran, M. D., a psychiatrist, performed medication therapy management on June 27, 2008, July 10, 2008, July 24, 2008, August 25, 2008 and September 25, 2008 (Docket No. 13, pp. 642-648; www.healthgrades.com/physician/dr-khoa-tran).

Dr. Keaton assumed Plaintiff's medication therapy management on May 21, 2009.  On June 13, 2009, July 14, 1009, September 10, 2009, November 12, 2009, December 17, 2009, January 22, 2010, March 16, 2010, July 13, 2010, July 24, 2010 and August 19, 2010, Dr. Keaton conducted 30-minute medication management review sessions during which the medications were assessed in conjunction with Plaintiff's symptoms and side effects.  Conducting a psychiatric evaluation and using the five-axis model,

18

Dr. Keaton concluded:

| THE FIVE-AXIS MODEL USED TO ACCOUNT FOR THE PATIENT'S MENTAL HEALTH. | DR. KEATON'S IMPRESSIONS OF PLAINTIFF'S MENTAL STATUS. |
|---|---|
| I. Clinical Disorders | Bipolar disorder, alcohol dependence, marijuana abuse and anxiety, NOS. |
| II. Personality Disorders and Intellectual Disabilities | Diagnosis deferred. |
| III. General Medical Condition | Hypertension, dyslipidemia, chronic pain, diabetes. |
| IV. Psychosocial and environmental Disorders | Moderate to severe with respect to primary support group, social environment, education, occupational, economic, legal system. |
| V. The GAF | 45. A score of 45 denotes serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job, cannot work). |

(Docket No. 13, pp. 552-553, 559, 562-563, 596-597, 605-606, 617-619, 626-627, 630-631, 635-642 of 882).

## V. LEGAL FRAMEWORK FOR EVALUATING DISABILITY CLAIMS.

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).  The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical.  *Id.*

When determining whether a person is entitled to disability benefits, the Commissioner follows a sequential five-step analysis set forth in 20 C.F.R. §§ 404.1520, 416.920.  *Ealy v. Commissioner of*

*Social Security*, 594 F.3d 504, 512 (6th Cir. 2010).

First, a claimant must demonstrate that he or she is not currently engaged in substantial gainful employment at the time of the disability application. *Id.* (*citing* 20 C.F.R. § 404.1520(b)). Second, the claimant must show that he or she suffers from a severe impairment. *Id.* (*citing* 20 C.F.R. § 404.1520(c)). Third, if the claimant is not engaged in substantial gainful employment and has a severe impairment which is expected to last for at least twelve months, which meets or equals a listed impairment, he or she will be considered disabled without regard to age, education, and work experience. *Id.* (*citing* 20 C.F.R. § 404.1520(d)). Fourth, if the Commissioner cannot make a determination of disability based on medical evaluations and current work activity and the claimant has a severe impairment, the Commissioner will then review claimant's residual functional capacity (RFC) and relevant past work to determine if he or she can do past work; if so, he or she is not disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(e); *Howard v. Commissioner of Social Security*, 276 F.3d 235, 238 (6th Cir.2002)). If the claimant's impairment prevents him or her from doing past work, the analysis proceeds to the fifth step where the Commissioner will consider the claimant's RFC, age, education and past work experience to determine if he or she can perform other work. *Id.* If the claimant cannot perform other work, the Commissioner will find him or her disabled. *Id.* (*citing* 20 C.F.R. § 404.1520(f)).

## VII. THE ALJ'S DECISION.

Upon careful consideration of the entire record, ALJ Jordan made the following findings:

1.  Plaintiff met the insured status requirements of the Act through December 31, 2012 and he had not engaged in substantial gainful activity since July 2, 2007, the alleged onset date.

2.  Plaintiff had the following severe impairments:

    a.  Anxiety related disorders.
    b.  Disorders of the back.
    c.  Diabetes mellitus.

3.  Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part. 404, Subpart P, Appendix 1.

4.  After careful consideration of the entire record, the ALJ found that Plaintiff had the residual functional capacity to perform a limited range of light work involving lifting, carrying, pushing and pulling up to 10 pounds, but not above shoulder level; standing and/or walking for up to six hours and sitting for up to six hours in an eight-hour workday; and involving no ladder, rope, or scaffold climbing. He could perform other postural

movements on an occasional basis.  From a mental standpoint, Plaintiff was limited to simple routine low stress tasks involving limited contact with the public.

5.    Plaintiff was unable to perform any past relevant work.

6.    Plaintiff was a younger individual on the alleged onset date, he had a high school education and was able to communicate in English. Given Plaintiff's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.

7.    Plaintiff had not been under a disability as defined in the Act from July 2, 2007 through the date of the decision on September 19, 2011 (Docket No. 13, pp. 29-38 of 882).

## VIII.  THE LEGAL FRAMEWORK FOR JUDICIAL REVIEW.

In a social security appeal, the Court's inquiry is limited to determining whether the ALJ's non-disability finding is supported by substantial evidence.  *Roberts v. Commissioner of Social Security*, 2014 WL 1123564, *1 (S.D.Ohio,2014) (*citing* 42 U.S.C. § 1383(c)(3); *Bowen v. Commissioner of Social Security*, 478 F.3d 742,745–46 (6th Cir.2007)).  Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.* (*citing Richardson, supra*, at 1420; *Ellis v. Schweicker*, 739 F.2d 245, 248 (6th Cir.1984)).  Substantial evidence is more than a mere scintilla, *Id.* (*citing Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir.1988); *NLRB v. Columbian Enameling and Stamping Company*, 59 S.Ct. 501, 505 (1939), rather, substantial evidence must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.  *Id.* (*citing LeMaster v. Secretary of Health and Human Services*, 802 F.2d 839, 840 (6th Cir.1986) (*quoting NLRB, supra*).

In determining whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Id.* (*citing Hephner v. Mathews*, 574 F.2d 359 (6th Cir.1978); *Ellis, supra*; *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536 (6th Cir.1981); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir.1984); *Garner v. Heckler*, 745 F.2d 383

21

(6th Cir.1984)). The Court may not try the case de novo, resolve conflicts in evidence or decide questions of credibility. *Id.* (*citing Garner, supra*). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the Court as a trier of fact would have arrived at a different conclusion. *Id.* (*citing Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir.1981)).

## IX. ANALYSIS.

Plaintiff insists that the ALJ:

(1) erred in determining that his impairments did not meet or equal the 1.04 of the Listing[5] or alternately make a reasoned analysis of why it did not meet or equal 1.04 of the Listing.
(2) failed to obtain medical expert testimony to show medical equivalence; and
(3) failed to make a decision that is consistent with other governmental agencies who determined that he was disabled.

## 1. THE ISSUE.

Plaintiff alleges that the ALJ erred when he failed to find that Plaintiff's back impairment met or equaled 1.04 of the Listing. In the alternative, Plaintiff suggests that the ALJ erred in failing to provide sufficient explanation for why his impairments did not satisfy 1.04 of the Listing at step three of the sequential evaluation.

### A. THE LAW.

---

[5]

Listing 1.04 describes "disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. The disease must be accompanied by evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b. 20 C.F.R. Pt. 404, Subpart P, App. 1 (Thomson Reuters 2014).

At step three of the evaluation process, an ALJ must evaluate whether a claimant's impairments satisfy the requirements of the Listing of Impairments enumerated within 20 C.F.R. part 404, Subpart P, Appendix 1 (the Listings).  *Copley v. Commissioner of Social Security*, 2013 WL 5308383, *5 (N.D.Ohio,2013).  The Listing of Impairments recites a number of ailments which the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  *Id.* (*citing* 20 C.F.R. § 416.925(a)).  Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing."  *Id.* (*citing* 20 C.F.R. § 416.925(c)(3)).

A claimant will be deemed disabled if his impairment(s) meet or equal one of these listings.  *Id.* In order to "meet" a listing, the claimant must satisfy *all* of the listing's requirements.  *Id.* (*citing Rabbers v. Commissioner of Social Security,* 582 F.3d 647, 653 (6th Cir.2009)).  However, if the claimant does not meet all of the listing's requirements, he may still be deemed disabled at this stage 'if his impairments "medically equal" the listing.  *Id.* (*citing* 20 C.F.R. § 416.926(b) (3 )).  To do so, the claimant must show that his impairments are "at least equal in severity and duration to the criteria of any listed impairment."  *Id.* (*citing* 20 C.F.R § 416.926(a)).

**B.**  **DISCUSSION**.

It is important to reiterate that Plaintiff must provide sufficient medical evidence at step three of the sequential evaluation to show that his impairment is equal in severity to a listed impairment.  The ALJ stated that he considered the Listings, paying particular attention to 1.04 of the Listing which deals with spinal disorders.  He then undertook a detailed analysis of the medical evidence of a back disorder provided by Plaintiff, including specific and accurate references to evidence that supported his decision. Contrary to Plaintiff's assertion, the ALJ was required to find that Plaintiff's back disorder did not qualify

as it did not manifest all of the criteria required to match the Listing.  Specifically, the ALJ correctly concluded that Plaintiff was not disabled because there was no clinical or diagnostic findings of (1) compromise to the nerve root to satisfy 1.04A of the Listing; (2) inflammation of the arachnoid to satisfy 1.04B of the Listing; or (3) motor loss resulting in an inability to ambulate effectively, which is required to satisfy 1.04C of the Listing.

The ALJ complied with the regulations which required that he perform an exhaustive review of the medical record and then set forth the Listings he considered.  The ALJ's analysis clearly sets forth sufficient explanation for his decision and his decision is sufficient to permit meaningful judicial review. The Magistrate finds that there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff's back impairment did not meet or equal the criteria in 1.04 of the Listing.

2.    MEDICAL EQUIVALENCE.

Plaintiff suggests that the ALJ erred in failing to use a medical expert to justify a finding that his back impairment was medically equivalent to 1.04 of the Listing.

A.    THE LAW.

An impairment or combination of impairments is considered medically equivalent to a listed impairment " * * *if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments." *Ridge v. Barnhart,* 232 F.Supp.2d 775, 788 (N.D.Ohio,2002) (*citing Land v. Secretary of Health and Human Services*, 814 F.2d 241, 245 (6th Cir.1986)(per curiam)).  Generally, the opinion of a medical expert is required before a determination of medical equivalence is made. *Id.* (See 20 C.F.R. § 416.926(b)).  To show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Id.* (*citing*

24

*Sullivan v. Commissioner*, 110 S.Ct. 885, 891 (1990)).

A claimant's impairments medically equals a listed impairment when "it is at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a) (Thomson Reuters 2014).   At the administrative hearing level, the ALJ is responsible for deciding medical equivalence.   20 C.F.R. §§ 404.1526(e), 419.926(e) (Thomson Reuters 2014).   In making that determination, the ALJ must review the entire record and the medical opinions of State agency consultants, and compare that evidence with the criteria for the relevant Listings.   20 C.F.R. §§ 404.1526(c), 416.926(c) (Thomson Reuters 2014).

As the ruling SSR 96-6p provides, the ALJ or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled.  *Blackman v. Commissioner of Social Security Administration*, 2014 WL 991943, *10 -11  (N.D.Ohio,2014); TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL 1996 WL 374180, *3 (July 2, 1996).  As trier of the facts, an administrative law judge or the Appeals Council is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments.  *Id.*  However, longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the ALJ or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.  *Id.*

The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5 or SSA-833-U5 (Cessation or Continuance of

25

Disability or Blindness) ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review.  *Id.*  Other documents, including the PSYCHIATRIC REVIEW TECHNIQUE FORM and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review.  *Id.*

   **B.   DISCUSSION**.

   Plaintiff contends that calling a medical expert was justified in his case to obtain an opinion as to the medical equivalency of his impairments to listed impairments.  He failed, however, to present an argument or other persuasive evidence to support his contention.  On the other hand, the ALJ exercised his discretion and made explicit findings that demonstrate he properly evaluated Plaintiff's impairments under 1.04 and 12.06 of the Listing.  It is clear to the Magistrate why the ALJ failed to consult a medical expert on this issue.  In reality, there are at least six reasons that the Magistrate concludes the ALJ did not err in failing to obtain a medical expert or updated medical expert's opinion with regard to the question of equivalency.

   First, because Plaintiff's "disorder of the back" was theoretically a non-listed impairment, there was no basis on which the ALJ could find that it was at least of equal medical or clinical significance to a listed impairment and therefore, a judgment of equivalence was simply unreasonable.

   Second, there are no other diagnostic and clinical findings relating to the back or mental impairments that exhibited the specified severity required in the Listings.

   Third, assuming that Plaintiff's back disorder is a non-listed impairment, the set of criteria for the most closely analogous listed impairment when used for comparison with the findings of the listed

impairment, is not equivalent in medical severity to the listed set to which it is most closely related.

Fourth, the signatures of Drs. Cozy, Semmelman, Keaton and Holbrook on the state agency medical and psychological consulting forms confirm that they considered all of the evidence regarding Plaintiff's mental impairments and that they ensure that at the initial and reconsideration levels of administrative review, medical equivalence was considered.

Fifth, upon careful review of the additional medical evidence adduced after the state agency medical and psychological consultants published their opinions, the Magistrate finds nothing in the form of updated signs, symptoms and laboratory findings that would trigger the ALJ's duty to reconsider an expert's opinion on medical equivalence. In fact, no additional medical evidence was received that suggests a judgment of equivalence may be reasonable.

Sixth, Plaintiff asserts the ALJ's finding that his impairment is not equivalent to the Listing but he fails to establish what part of the Listing affects his substantial rights, how his substantial rights have been affected and what part of the ALJ's decision, if any, casts into doubt the existence of substantial evidence to support the ALJ's decision.

To summarize, Plaintiff failed to present (1) a reasonable theory of medical equivalence regarding his physical impairments, (2) evidence suggestive that a judgment of equivalence regarding his physical impairments may be reasonable or (3) a reason that a medical expert must be called regarding the question of equivalency. The medical record highlighting Plaintiff's mental impairment is sufficient to show that equivalence was considered by the state agency medical and psychological consultants. The ALJ's decision not to consult a medical expert on the issue of medical equivalence on these points is sustained.

### 3.    DISABILITY DECISIONS BY OTHER AGENCIES.

Plaintiff expressed difficulty in understanding why a decision by another governmental agency that he is disabled is not binding on the Social Security Administration (SSA).

### A.    THE LAW.

Title 20 C.F.R. §§ 404.1504, 416.904, explains the role that decisions by other governmental and non-governmental agencies play in the SSA disability determination process:

> . . . decision by any non-governmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind.  We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency [e.g., Workers' Compensation, the Department of Veterans Affairs, or an insurance company] that you are disabled or blind is not binding on us.

TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS; CONSIDERING DECISIONS ON DISABILITY BY OTHER GOVERNMENTAL AND NON-GOVERNMENTAL AGENCIES, SSR 06-03p, 2006 WL 2329939, *6-*7 (August 9, 2006), sets forth the SSA's interpretation of 20 C.F.R. §§ 404.1504, 416.904:

> . . . only a State agency or the Commissioner can make a determination based on Social Security law that you are blind or disabled.  Our regulations at 20 C.F.R. §§ 404.1527(e) and 416.927(e) make clear that the final responsibility for deciding certain issues, such as whether you are disabled, is reserved to the Commissioner (*see also* SSR 96–5p, "TITLES II AND XVI: MEDICAL SOURCE OPINIONS ON ISSUES RESERVED TO THE COMMISSIONER").  . . . we are required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and non-governmental agencies (20 C.F.R. §§ 404.1512(b)(5) and 416.912(b)(5)).  Therefore, evidence of a disability decision by another governmental or non-governmental agency cannot be ignored and must be considered.

### B.    THE RESOLUTION.

It is apparent that nothing in the regulations specifically obligate SSA to accord controlling weight to the opinions of physicians who make disability determinations for another governmental agency.

Nevertheless, the ALJ must evaluate those opinions made for another governmental agency by their agency physicians as such opinions qualify as evidence that relates to an individual's claim.

Here, consistent with the SSA regulations, the ALJ addressed the disability findings of Drs. Cozy, Hanahan, Keaton and Lee, all of whom (1) completed a disability determination for ODJFS based on its rules and (2) determined that Plaintiff was unemployable[6] (Docket No. 13, pp. 288-289, 414, 425-426 of 882).  The ALJ explained the weight given to each medical source statement.  He discounted the opinions of Drs. Cozy and Keaton in this regard because they each overestimated the effect of drug use on Plaintiff's level of functioning even though Plaintiff had not undergone drug treatment since May 2009 (Docket No. 13, pp. 36-37 of 882).  The ALJ discounted Dr. Hanahan's opinions because they were embellished and not consistent with his treatment notes and findings on physical examination (Docket No. 13, pp. 35, 36 of 882).  The ALJ discounted Dr. Lee's opinions for the reasons that the conservative treatment given was inconsistent with Plaintiff's complaints of pain (Docket No. 13, p. 35 of 882).

The Magistrate finds that the medical source statements provided by Drs. Cozy, Hanahan, Keaton and Lee provided important medical information that the ALJ considered when assessing disability. However such evidence was not binding on the determination of whether Plaintiff was disabled for purposes of social security disability.

---

[6]

Plaintiff's primary care physician, Dr. Modarelli completed a ODJFS form in 2007, and determined that Plaintiff was employable even with marked limitations in bending (Docket No. 13, pp. 423-424 of 882).

## X.  CONCLUSION

The Magistrate recommends that this Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate Judge.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   July 15,  2014

## XI.  NOTICE FOR REVIEW

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.

30